20-1478 Diamond Sawblades v. United States. Mr. Menegez, if I mispronounced your name, I apologize, but you're up. May it please the court. Both sides maintain records in the normal course that would allow us to determine the origin of the sawblade that's sold to an affiliated company in the United States to a certainty. Therefore, you have missed information on the in your voice. So is there anything you can do about that to make it a little cleaner? Maybe if I speak closer to my speaker, is that okay? Okay, give it a try. Thank you. Okay, I'm holding it right next to me. So as I started to say that, you know, both on tools China sold through two affiliate sales companies in the United States and maintained records in normal course that would allow it to determine the origin of sawblades that's sold to the affiliate companies to a certainty. Therefore, there's no missing information on this record that would permit commerce to resort to facts available, much less adverse facts available. Therefore, the U.S. sales universe reported by Boson was reliable. This is Jeff Toronto. Can I ask you this question, which is going to take as a premise something that I think you just said you disagree with, but I ask you to take this as a premise, because as a practical matter, it seems to me there's some difference between the legal principles and what you need to get a large amount of relief. And here's my question. I want to ask you to test an information-specific potential interpretation of 1677EA. And it's this, for a fact needed for a commerce determination, 1677EA authorizes use of substitute information only for missing or compromised information, by which I mean only for missing information or defective, late, unreliable, or unverifiable information. It does not authorize use of for information that is present and is uncompromised, in the sense I just mentioned, because there's no information gap to fill as to that submitted, uncompromised information. My question is, does any case or regulation, for that matter, preclude that information-specific interpretation of 1677E subsection A? Well, the way I... I'm sorry, Your Honor. The way I understand your question is that if there is valid information on the record to establish a fact, that commerce cannot resort to other facts to substitute for that fact. Does that correct my understanding of your proposition? That would be one, yes, much simplified version of that. That's right. So that, for example, and I think you understand what I'm talking about, if 97.5% of the imported units had uncompromised information about their source of origin, then the theory would be the only units, only imported units, for which facts otherwise available, to use subsection A's language, could be used would be at the outside, the universe of the 2.5%. Well, Judge Toronto, you skipped right to the end of my argument, brilliantly, if I may say. We would note that commerce did not criticize the 97.5% at all in its remand, nor did the court. But I was actually particularly interested. I tried to ask, is there a case that the government or Diamond Sawblades, the domestics, will say, oh, no, you can't possibly say that the following cases explain that, you know, once there's some missing information, then commerce is free under subsection A to resort to facts otherwise available as to the whole universe? Well, I would submit that these are very fact-intensive driven decisions that are case by case, and that as a general proposition, under LAFCO, this federal circuit, you know, margins have to be calculated as accurately as possible. And so, therefore, if there's missing information, the facts available or adverse facts available have to be cabined to the missing information. And as the hierarchy that both unused to establish the origin was progressive, it essentially created safety at each step for a chunk of the origin of the chunk of the sawblades. And by the time we got to the end of step two, with that certainty, 97.5% of the blades were safely and accurately designated as to their origin. Is it a disputed fact that the only problems encountered fall within the universe of those entry items that you say represent 2.5%, which is to say the universe of items for which the first two steps of the process for identifying country of origin did not supply an answer, and this mysterious FIFO methodology had to be resorted to? I would absolutely say that. There's nothing on the record that the defendants or defendant court opinion. And so, that information is good. It's like if you had three different colored poker chips on a table, and the man operating the table takes his stick and moves the green ones to safety and then the blue ones to safety. What's left is the red chips, the 2.5. And so, that's where we use the FIFO step, which I would be happy to explain. Can I interrupt you one second? Yes. I mean, you're right, and we can certainly ask the government if their view is that there was some potential or identified problem in verification with respect to the 97.5. I look for it in the record, and I did find on Appendix 3049, there's some ambiguity. This is the government's position on remand, and they say something like, given that the sample sale verification comprised a small number altogether, we cannot be confident there were no other errors with your methodology. And it's not clear to me if they were just talking about FIFO there, or whether that statement also went to the other first two steps in the process. Do you have any view on that? Yes. I mean, it's absolutely clear that they could have only been talking about FIFO, because you will read the original verification report in vain to find any discrepancies for the other 97%. Normally, a verification report will go through each material fact in the database of the company, and if they find at any point in the outline any discrepancies, they'll say so. Otherwise, you'll see repeated throughout the verification report, we noted no discrepancies. So, when they discussed the tiny error, which we would love to put in context for you on the FIFO step, first of all, it was four pieces on one invoice for one trading company, Pioneer. There was no errors for both on that step. But regardless... Can I ask you just a general question about this process, this three-step process? Do you have a calculation or an assumption upfront as to what percentage of the goods will fall under the FIFO step three, or is it just... It could have ended up as being 40% or 50% just as easily as it ended up being 2.5. Can I direct you to the confidential appendix 3075, where we do have that calculation? It is the 2.5. It's actually a smaller number, but we wanted to make it public for your benefit. I'm sorry, what was the citation? Confidential appendix 3075. Okay. And if you look at the second full paragraph, third line, you'll see that calculation, where they added up the FIFO step, the two companies, Boson plus Pioneer, and then divided by the total of the other steps for Boson and Pioneer, the total sales. And that's the percentage of the total sales is 2.4% of the... No, no, no. I'm not quibbling. I don't think anybody is disputing the 2.5 FIFO category as it turned out in this case. My question was more general, which is with this three-step procedure, do you have an inkling when you start running the goods through the process as to what percentage is going to fall out in category three under FIFO? No, I mean... Quite clear, for example, that it will only be a minuscule percent. Can we have confidence that it's only... Sorry, go ahead. The company only used FIFO as a default for the residual kind of basket category of items that could not be established by its other records. So, in a perfect universe, they would not have had to resort to FIFO, but they used FIFO in their normal practice. And I have a very simple analogy that I think the court could understand. Dinosaur blades are made of metal and they rust and they get bad over time. So, it's just like the milk in the supermarket. The man who manages the supermarket or whoever the woman puts the oldest milk at the front, hoping you'll buy that, and they'll take the newest milk and tuck it in the back of the refrigerator. So, that's what this company physically did and commerce verified that verification. And so, by knowing that and knowing the purchase dates by these trading companies and the entry dates, the company can determine with a certainty which Thai blades or Chinese blades were purchased first. And then they applied the logic that they in fact implied in business that then those blades would have been sold first. And so, knowing the year of the period of review, so it's always 12 months, they could determine using that methodology the origin of the remaining residual basket category blades. Mr. Judge Clevenger, why does purchase date have anything to do with country of origin? Well, this is just the FIFO method. They're making an assumption. My question is I've never understood why does FIFO tell you anything about country of origin? Well, let's just take an example. You purchase 50 Chinese blades first and then 100 Thai blades second. And the way they operated their inventory, they take the oldest blades first and sell them to the customer. So, of a particular product type, you get an order for 75 blades. Well, the first 50 had to be Chinese because you would have sold them first to the downstream US customer. The last 25 would have been Thai. So, do I understand? I mean, it's just that the arriving shipments are marked by country of origin and you have the dates of the arriving shipments, so they correlate. That's right. It's very important to understand, although I don't think it's dispositive of the case, that of course the origin was declared at entry and the origin was stamped on the blade itself that was handed to the customer on the origin on that invoice, but it didn't appear necessary to them. And so, for us to back into that origin, we had to use the FIFO methodology for that 2.4% of the sales. And we had other documents that were original source documents of the company to establish the 97.5% like their unique product code sold from each country or unique unit prices on a price sheet for each country. That's how we determine certainty. And those documents were always necessary. Yes? So, Judge Clevenger, can you describe what it is that Commerce seems to think is the better method of identifying country origin that your company had but did not use? Right. So, it's the downstream invoice by both Sun, USA, or Pioneer that did not mark the origin of the blade on the invoice in their computer system. So, it was physically marked on the blade, but when we had to develop a database, you know, a year after the fact and we were selected for review, that origin was not on that downstream sales invoice. So, what they're saying is because that one fact, that origin was not on that invoice, we can't establish the origin at all. But, of course, that's not lawful because Commerce and the courts are required to consider the entire record. And based on the entire record and both other records and documents kept in the normal course, you can determine with certainty the origin of at least 97.5%. And the invoice there is the invoice that both Sun, USA, or Pioneer should have created when they sold to the first domestic customer? First unaffiliated customer. So, would our lives be easier if the origin were on there? Yes. But we would have always had to verify and establish the accuracy of every material fact on that invoice. And we could do it with certainty at 97.5% and we used a reasonable allocation method, the FIFO, for the remaining 2.4%. Can I just... I'm sorry, this is Judge Crouch. This is an aside, but it's my recollection that even in the first portion of this case where Commerce sided with you, they did say, this is fine, but don't do it next time. Go back to the regular country of origin. Am I correct in my recollection of what the record... Yes, you are correct. I noticed we're past 15 minutes. I'd love to keep talking, but... Well, I mean, whether you keep talking is kind of up to us and not up to you, but I appreciate it because you retained quite a large chunk for rebuttal. But let me ask my colleagues if they have any further questions, and then we'll let you sit down. Anything more? No, thanks. Okay, we'll hear... Thank you. All right. Thank you, Your Honor. ...government, and you've still got time remaining at rebuttal. Mr. Todor? Yes, Your Honor. You're up. May it please the Court? We respectfully request that the Court affirm the decision of the Court of International Trade, affirming Commerce's remand results. We believe, based on especially the remand results, pages 9 to 12, Commerce discussed its factual basis for concluding that Bozeman's reporting was unreliable, and that justified the application of facts otherwise available. Also discussed at pages 21 through 25 of the remand results is the conclusion that Bozeman failed to act in the best of its ability, both in terms of the FIFO methodology... I'm sorry to interrupt, but we're short in time, and there are lots of provisions here. Our focus has been on the 2.5 versus the 97.5. Can we stick to the 97.5? And let me ask you, what in 677 E-A, which provision is the government relying on to establish that the F-A was a problem with respect to the 97.5 before we get to A-F-A? That Commerce, in its remand results, cited at least two provisions of E-A, those being fail to provide information in the form and manner requested, which is 2-B, and significantly impeded the proceeding, 2-C. So it concluded that Bozeman didn't provide the form and manner for anything, the 97.5 or the 2.5, because it didn't present the direct information Commerce requested, and then also impeded the proceeding with respect to the errors that were found at verification. And on page 2967, page 12 of the remand results, Commerce found, if you look at, I believe, note 37, there were errors... Let me ask you then about... Page 3049. I'm sorry. My apologies. It's not clear to me the B part of it. You rely on the phrase in the form and the manner requested. So what in the record of when they were going through providing this information, doesn't that contemplate that there was a request from the government, you've got to do it this way and no other way? And I'd like to know where that is in the record, or if you disagree with how I'm construing this phrase. Well, we disagree. It needs to be quite as explicit as the court's question implies, but the request was made at page C1 of the initial section C questionnaire, which asked the person to identify the subject merchandise. What page in the record is that? I didn't see it in the joint appendix when I was reviewing it this morning in the CIT appendix. I believe it was at tab four in the CIT appendix and was public document in 167. And as the court discussed in its remand opinion, both opinions, knowing the country of origin is a basic consideration when you're talking about identifying subject merchandise, which is diamond saw blades from China. No one disagrees with that. The question is whether or not there was ever this stated request, quote, direct specific information. So the request was on page C1 there. It didn't say you must record on your invoice that it was China as opposed to Thailand, but it did say identify your sales of the merchandise, which is the Chinese site. And then Commerce issued two supplemental questionnaires because it felt that FOSUN's earlier reporting needed clarification on what was from China as opposed to Thailand. And I'm sorry, I believe the court was starting a question. Well, yeah, you're talking really fast as you can basically understand from the question from the presiding chief judge that we're interested to know where did Commerce issue an instruction so as to be able to say that FOSUN didn't comply with the form and manner. And you're telling us that there's no evidence in the record in front of this court to support your argument. We have to go back to the appendix. And so we discussed that in our brief that that was requested. I believe it was also discussed in both of the opinions from the Court of International Trade in the appendix before you. But for that specific document that the court has asked here at oral argument, that's my understanding of where it is. It sounds to me actually as though that document as you've described it just absolutely does not support the finding. It doesn't say you have to specify a country of origin if you have things from different countries. It says to identify the subject merchandise. Okay. And then Commerce issued supplemental questionnaires asking FOSUN to explain further because it didn't have... What about the other grounds under 1677EA that Commerce invoked? I thought actually it invoked four of them. It said under A1, information is missing and then three of the subsections or paragraphs under A2, impeding the proceeding, the one we just talked about and maybe... Cannot be verified. Form and manner impedes proceeding and cannot be verified, which is subsection D. And Commerce did find this information cannot be verified. So what's the support for finding those as to the 97.5% of the entered items that there appears to have been valid essentially or even actually undisputed identification of the origin, just not in the very, very best document that would have done it. Right. And to clarify, it wasn't after the fact methodology. They were using product codes and unit prices. They were not. They didn't have the information of country of origin, which they conceded that they had on the warehouse and were stamped on the items. Commerce, when you look at page 12 of the remand results as Commerce's explanation, I believe the confidence in the record as a whole, and it concluded that there was lack of confidence. And they also note in note 37 on that page on appendix 3049, CIT observed that Bozeman's errors in reporting physical characteristics affected three out of 15 transactions identified at verification and related to multiple other product characteristics, which we find further supports our determination not to rely on Bozeman's information. Commerce, at least here, didn't explicitly state whether that was in the 2.5 or the 97.5, but there was not an affirmative statement that we know of. The Commerce said that they have no possible inkling that there could have been anything wrong with the 97.5. It's rather the opposite. The errors they found on Bozeman's methodology led them to determine that the reporting on the whole was unreliable. You can't point to anything in the record that says, here is a problem that we discovered, whether on these three traces or elsewhere, that applies to an entry item for which the first two otherwise resolved the origin question. Okay, so the only statements that seem to go to potential errors in the 97.5 as opposed to the 2.5 was that footnote that I just read to the court, but the larger point is that- And that's page, I'm sorry, that's page what of the joint appendix, please? 3049. Oh, okay, that footnote, okay, yeah. And Commerce was conducting- Yes, I'm confused, I'm sorry. I've been looking- I'm sorry to interrupt, but let me get my question in here too, because I'm quite confused. 3049 is what I asked your friend about, because that was the only thing I could find in the record that arguably raised some question about the 97.5%, but it doesn't get me there. If you're relying on the main paragraph in the middle of that page, so what sentence are you relying on to suggest that there were problems with something other beyond the FIFO methodology? So it's the sentence in the middle that says, given that the sample sales traces at verification comprise the sole number of transactions altogether, we cannot be confident that there were no other errors with both those methodology, even if we were to accept it. And then there's a reference to note 37, and note 37 discusses the errors on physical characteristics of the Commerce-discovered verification. Right, and so that's ambiguous. But look at the last sentence in the paragraph, which I think maybe gives it some clarity, because the last sentence in the paragraph says, for this reason, we now find that based on our verification process, their supplemental responses explaining FIFO were not satisfactory, which leads me to conclude that even though that sentence may be ambiguous, all this paragraph was talking about were potential and actual problems with the FIFO methodology, but not with respect to the remaining 97.5% of the data. Am I reading it a different way than me? What about that last sentence? That takes us back to really talking about FIFO and only FIFO, correct? Is that a fair characterization? That sentence certainly discusses that there for that particular finding, but we also know that Commerce's overall finding was it resorted to, you know, facts otherwise available for the entirety of the reporting, because it ultimately led to the conclusion that it felt that the reporting on the whole was unreliable, in part due to the specific errors with the FIFO methodology found, as well as these physical characteristic errors, which it doesn't specify there whether they were only the FIFO portion or not. Could I ask a question, Judge Clevenger? Assuming you're arguing that because some error was found as to the FIFO, that supports a reasoning that you could be suspicious as to the 97.5% being verifiable, what's the rationale for suspecting there could be a problem with 97.5%, which is not FIFO, because there had been a problem with FIFO? Other than the fact that the FIFO situation shows that it's humanly possible to have committed error. All right. So, and Commerce's ultimate conclusion was not that it's just, you know, failed to be perfection, but there's ultimately, you know, lack of attention to record keeping, which this court found was necessary under Peer-Bearing and Nippon-Steele. You're not answering my question. My question is, why does poison with regard to 2.5% necessarily require poisoning of 97.5% as a matter of law? I mean, we're not saying it's required in all cases. We're saying that Commerce ultimately concluded that here based on lack of confidence in reporting, and that was supported by substantial evidence. I'm asking whether that conclusion is sustainable as a matter of reasoning. We believe it is, because Boesen's entire reporting scheme was indirect and after the fact, and that FIFO was part of that, so that if there are errors, even if isolated to what they described as step three of that process, this is all part of an indirect after-the-fact process, and Commerce lost confidence in that process. Assume we disagree with you on 1677E1, and say the necessary available was available, then that argument doesn't apply at all. That's, I believe, the prerequisite for 1677EA, so if the court disagrees that there's necessary information not available on the record, then obviously the second step doesn't happen. That what we're, the 97.5 information was clearly on the record. The question is whether or not it was insufficient to accomplish the task of identifying country of origin, and Commerce earlier decided that it was sufficient, and then now only tells us that it was insufficient because there was a better method available. And my understanding is, okay. Sorry, I thought the court was finished. Please continue. I just don't see the, I don't see the rational connection between saying because the FIFO method may have a problem, the other methods of identifying it are not trustworthy, in a situation where you can't point to any verification problems in connection with the 97.5. And that we would point the court to, you know, Commerce's reasoning in the remand results that this was part of an overall after the fact reconstruction on the part of BOSIN because it didn't keep the records in the normal course of business, and Commerce lost confidence in its reporting as a whole due to that. And it believed that the necessary information would have been supporting the actual country of origin at the time. And that was... You're using 1677B, putting that cart in front of the horse. You're using B to answer questions in A. We would respectfully disagree with that because we believe that the necessary information... Why isn't that so? The entirety of the remand decision is based on the fact that BOSIN had a better method of doing things and didn't do it. And for that reason, you can't trust the information they put in. We would say that the necessary information missing from the record was the country of origin, which BOSIN didn't report in the form and manner that Commerce initially requested, constructed it after the fact, and Commerce concluded that the method it used was faulty. Can I just sum up, just Mr. Toder, just to see where we are on this one very narrow question? If, hypothetically, we were to conclude that if you want to include the 97.5%, you've got to come up with some identifiable problem with that data, should we be remanding it and based on the existing record, would the government want another crack or think it would be worthwhile because there is a likelihood or possibility that the government could come up with those problems? Or are you willing to concede now that the record does not contain identifiable problems on verification with respect to the 97.5? I don't think we can concede that right now because of the ambiguity regarding the errors on the physical characteristics that we discussed in response to the court's question and whether there are other potential errors discussed in the verification report that were not previously briefed by the parties at the CIT. We need to look at that as well. Okay. Thank you. Now, we've exhausted all of the time for the appellee, but Ms. Thorsen, you had originally allocated three minutes, and if you have something relevant or important to say, we'll give you that time. Yes. Thank you, Your Honor. I'd like to direct the court's attention to the fact that 19 U.S.C. 1677 E.A. contains sections one and sections two, necessary information not being available on the record, or any of a number of things can justify a resort to the facts available, including one that Commerce found here and that we didn't discuss, which is significantly impede the proceeding. This is a case in which even in its original final results, Commerce understood and treated Bozum's reporting as deficient, referred to the absence from the record of the country of origin information it had requested, and treated country of origin information in a direct fashion as necessary. But also, they had to issue two supplemental questionnaires. They had to conduct a origin-specific verification just to try and figure out what the heck Bozum was doing with its reporting. This was not normal. Ms. Thorsen, let me ask you, on this third ground, in the record, my read of the record is what all Commerce said about this third ground was that 3046, and its comments were completely contrary. Missing something in the record, can you point me to something else that Commerce said which would illuminate how it significantly impeded the proceeding under the third category? Yes. I think if you look at the original determination at 2966 through 2969, it discusses the efforts that Commerce went to simply to determine and evaluate this after-the-fact indirect origin methodology, and none of that would have been necessary at all had Bozum kept records directly of origin, which was certainly the normal and standard expectation, particularly for a party that had been a respondent in several prior reviews and the investigation. A major point that we haven't discussed is that even in its original final results, where Commerce relied on the reporting that Bozum provided, it did so pursuant to its understanding of 19 U.S.C. 1677 M.E., which states that Commerce will rely on reporting that it isn't otherwise happy with so long as certain conditions are in effect. But one of those conditions is that the respondent has acted to the best of its ability, and that standard has been elucidated by this court as requiring a respondent to maintain full and complete records of all the information it would reasonably anticipate being called upon to provide here. That has to include origin information. I'm sorry to interrupt again. This is Judge Prost. But maybe we're reading the statute differently, and you probably have more experience than I in interpreting it. But under EA, it lists the significantly impede others. It seems that then there's an exception that says where best of its ability comes in sort of the exception to if you've done that. It's not a sort of first-off category that you look at. It's a way you can defend yourself if you've messed up on the earlier categories. Am I reading the statutory provisions correctly? I'm not sure that you are. They are, interestingly, chicken and egg in some ways, because one way you can defend yourself against the application of facts available or one of the ways you can not exactly defend yourself against facts available, but call upon Commerce to use information and rely on it, even if it isn't exactly the standard type of information that it normally relies on. You can say, well, I acted to the best of my ability in supplying this information. The information you have is what I can provide you while acting to the best of my ability. And then Commerce must use that deficient information or what it would normally consider to be deficient data. And Commerce directly relied on that statute here. One of the things that the Court of International Trade pointed out to them in the opinion remanding the case originally was that didn't make sense since the I'm relying on your deficient information statute of 1677 M.E. has as a prerequisite acting to the best of your ability. And that requires you to maintain full and complete records of all the information you're reasonably anticipating being called upon to produce. Bozeng simply didn't do that here. They had the information and failed to maintain and track it. All right. Thank you very much. We'll turn back to Mr. Neges and I don't know how much time you have left, but we'll restore five minutes of your rebuttal that you had initially reserved. Okay. I appreciate it, Your Honor. Just to clarify some insights to the record, if you turn to Appendix 732, that is the generic questionnaire and our response to it. So in counsel for the defendant, it's saying, well, you know, we asked them the question directly. You'll read that generic questionnaire and it doesn't say anything as specific as counsel or defense is maintaining. And that is because responding to a dumping questionnaire is more art and science. Every company has different records and different challenges meeting the requirements of the questionnaire. So commerce leads and flexibility and how they answer the questionnaire. So that's, you know, that gives you the, and we track through that in our initial brief, but then they asked two very limited, small supplemental questionnaires to us. So they always accepted this methodology and the explanations. They were just saying, can you give us a little bit more documentation? I've been through cases with nine supplemental questionnaires. If you read the flow of what, how commerce treated both son and the investigation leading up and through the verification, it's clear that they fully accepted and understood this methodology throughout. Now, when you get to that slip note cited by the counsel for the defendant on the page of interest to the chief judge, it concerns a completely different issue that has nothing to do with the country of origin. And the country of origin is the absolute focus of the department's remand and of the second court's opinion, the lower court's opinion. So that is a side issue that commerce faces. They relegated it to a footnote. That's evidence alone. But when you look at the verification report, it was a minor issue that commonly comes up in verification. So in sum, they never asked us to report the information some specific way. It's just when they got it back on remand, they decided to use that as a pretext for their decision. And, you know, there could have been five different ways we could have identified this information differently with different facts and circumstances. But based on our circumstances, this is how we did it. And, you know, if... To Judge Clemenger, are you saying that footnote 37 on page 3049 is not pertinent to country of origin? Absolutely not. It had to do with the baskets you put the products into to match them for cost and sales price to calculate a dumpy margin because they calculate the dumpy margin on, like, apples to apples, like, product group one, cost, product group one, sales. And so we had misidentified some of the product matching to misclassify three of those items on those sales traces. But they were unique. And then they fell into a unique category when they were corrected. So their cost still matched them exactly. And it had no impact on the margin. Commerce clause is insignificant. It happens in almost every case because these product matching assignations are very complicated. And so, anyway, it has nothing to do with origin. They've made this whole case about origin. And as the panel, I think, is pointing out, they have no evidence whatsoever to point to a discrepancy of the 97.5%. And when you read through the verification report, I think you would come to the same conclusion. And I would, you know, advise revisiting that report. Can I... This is Judge Toronto. Can I just follow up on something the Chief asked? Except for that sort of single sentence, I think 3046, where in the redetermination decision, Commerce mentions the impede the proceeding. Did Commerce either flesh that out elsewhere or make a... Say anything else that would fall under that heading of impede the proceeding? No. And the original, you know, the flow of the original questionnaire and supplemental questionnaires, verification report and issues memo makes it clear that we didn't impede the proceeding at all. Commerce didn't think so. The people who came to visit us didn't think so. You know, it might help you to understand this is not just like 25% of the FIFO data that was flawed at verification. This is four pieces on one invoice that had multiple pieces on it. In other words, four pieces out of 170,000 pieces of saw blades. And, you know, they had 16 sales traces because the sales traces contain most of the information in the US sales database. They might have like 60 columns of data and they have to verify all of them. They're not going to take a single thing on the sales invoice at face value. They have to trace back to original records just like we did for origin. And so what they did is they took 16 sales traces for the overall database, but they tested many more of these invoices for the origin issue. What do you think three people did for three days? 16 sales traces, you can wipe them out in a day. So they did a lot more testing than the lower court understood. And that's one of the reasons we felt the lower court acted to abuse this discretion of remanding in the first place. Counsel, let me ask you one final question on my part, which is that even in the original AFA analysis where Commerce found in your favor, they did say they did direct BOSUN to maintain country of origin records and future anti-dumping proceedings in which you may be selected for examination. So that may be telling or not telling for this case, but is there any dispute on your have the obligation to comply with regard to the country of origin records? Correct. It would be preferable and it would have been easier for us here, but whatever we put on an invoice, we always have to verify back to original records. And that's what we did. My colleagues have any further questions? Nothing for me. Thank you. Nothing for me. Thank you. All right. Then that will conclude our proceedings. We thank both sides and the case is submitted. Thank you. Thank you, Your Honor. The honorable court is adjourned from day to day.